21 F.Supp.2d 1305 (1998)
Dale Jean TERWILLIGER on behalf of herself and all other employees of Home of Hope, Inc. similarly situated, Plaintiff,
v.
HOME OF HOPE, INC., Defendant.
No. 96-C-1042-H.
United States District Court, N.D. Oklahoma.
July 24, 1998.
*1306 Gerald Robert Lee, Pryor, OK, for Plaintiffs.
Steven Ernest Holden, Terry Scott O'Donnell, Karen Marie Grundy, Best, Sharp, Holden, Sheridan, Best & Sullivan, Tulsa, OK, Brian E. Dittrich, Mills & Whitten, Tulsa, OK, for Defendants.
Mark Lawton Jones, Office of Atty. Gen., Oklahoma City, OK, for Oklahoma Dept. of Human Services, amicus.
D. Kevin Ikanberrry, Stephen L. Andrew, Stephen L. Andrew & Associates, Tulsa, OK, for Gatesway Foundation, Inc., amicus.

ORDER
HOLMES, District Judge.
This matter comes before the Court for a determination of whether Defendant Home of Hope acted wilfully in connection with an alleged failure to comply with the provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. A hearing was held on this issue on July 20-21, 1998. The parties have consented to having U.S. Magistrate Judge Claire V. Eagan hear evidence on the general household work exemption and issue a Report and Recommendation with respect to whether Defendant is liable to Plaintiffs under the FLSA and, if so, the amount of damages. Based on the testimony and exhibits at the hearing, the Court hereby enters the following Findings of Fact and Conclusions of Law.

Findings of Fact
1. This case arises out of a dispute regarding overtime compensation by approximately 31 Plaintiffs who were employed by Defendant Home of Hope as Habilitation Training Specialists ("HTS") or House Managers in the Supported Living Program.
2. Home of Hope is a not-for-profit corporation, the mission of which is to serve developmentally disabled individuals.
3. Home of Hope's Supported Living Program provides services for adult clients with developmental disabilities in a residential setting.
4. The goal of the Supported Living Program is to enable clients to live independently.
5. From approximately July 1, 1994, to June 30, 1996, Home of Hope utilized the "companionship services exemption" set forth in 29 U.S.C. § 213(a)(15).
6. From July 1, 1994, to June 30, 1996, HTS staff and House Managers were not paid the premium portion for hours worked in excess of forty (40) per week.
7. During the time that the companionship services exemption was utilized, the HTS staff and House Managers were allowed to work up to sixty (60) hours per week, and were paid "straight time."
8. Defendant first learned of the companion exemption in 1993 when Home of Hope's Director, DiAnna Hoover, attended a conference at Western Hills sponsored by the Homeward Bound Review Panel. At that seminar, Ms. Joni Fritz, the Executive Director of the American Network of Community Options and Resources ("ANCOR") advised that the companionship services exemption would apply to circumstances such as the Supported Living Program.
9. Ms. Hoover attended a second conference on about April 15, 1994, in Tulsa, during which Ms. Fritz again discussed the exemption.
10. At both the 1993 and 1994 conferences, Ms. Fritz was accorded the deference of an authority on the companionship services exemption by both conference officials and state officials in attendance who were charged with enforcing the FLSA in Oklahoma. Ms. Fritz stated at both conferences *1307 that the companionship services exemption would apply to Defendants' case.
11. Ms. Fritz is not an authority on the FLSA. Further, it is not reasonable to rely on Ms. Fritz's analysis of applicable labor law. She has no personal expertise, and her only source of information is a purported consultation with a now-deceased low-level analyst at the Department of Labor. Therefore, any opinion she may now render, or may have rendered in the past, with respect to the companionship services exemption is entirely without authority. Nonetheless, since the 1993 and 1994 conferences were sponsored by significant industry figures and Ms. Fritz was endorsed as authoritative by state officials involved in both social services and labor law enforcement, any reasonable participant at the conference would believe that Ms. Fritz's views were authoritative.
12. Ms. Hoover brought the information she learned at that seminar to the attention of the Board of Directors of Home of Hope on April 23, 1994.
13. The issue of utilizing the companionship services exemption was brought up again at the next meeting of the Board of Directors on May 27, 1994.
14. Mr. James Taylor, Defendant's public accountant, subsequently wrote a letter that stated in its entirety as follows:
We have discussed the Department of Labor's exemption from wage and hour laws for "companionship services" and how this exemption could apply to Home of Hope's Supported Living program. From a policy standpoint, I have no reservation about Home of Hope applying the exemption. From the standpoint of administering the Supported Living program, the exemption should have the effect of minimizing Home of Hope's overall cost of service which would maximize the administrative reimbursement rate.
Based on our conversation, it appears you are addressing any nonfinancial considerations. If I can be of any further help, please let me know.
15. Ms. Hoover also discussed the exemption with Defendant's labor attorney when consulting him in connection with an unrelated employment law matter.
16. At the time that Home of Hope was deciding whether to utilize the companionship services exemption, other providers of services to developmentally disabled clients were also using the exemption.
17. On June 24, 1994, the Board of Directors of Home of Hope voted to apply the companionship services exemption beginning on July 1, 1994.
18. The primary reason Defendant applied the companionship services exemption was to further continuity of care in the lives of its clients. Developmentally disabled persons require stability. Because the staff could work more hours, there were fewer employees in the clients' homes.
19. The services that Home of Hope provides to its clients are governed by a series of contracts with the Oklahoma Department of Human Services ("DHS"). Under its contract with the State of Oklahoma, Home of Hope is paid through a "cost settlement" program. Under the cost settlement program, the provider's costs are reimbursed up to a certain amount ("allowable cost"). If the provider exceeds its allowable costs, the provider will not be reimbursed for those costs which exceed the amount of allowable costs. If the provider's expenses are less than the amount of allowable costs, the provider will only be reimbursed up to the amount of its actual expenses. Under the cost settlement program, providers such as the Hope of Hope are not allowed to make a profit.
20. Since the financial burden of care for clients in the Supported Living Program is borne by the State of Oklahoma, there is no cost savings to Home of Hope by applying the companionship services exemption  only a cost savings to the State.

Conclusions of Law
1. Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., hourly workers must be compensated at a rate of one and one-half times the regular rate for hours worked in excess of forty (40) per workweek.
2. An exemption to this general rule is found in the provision dealing with "companionship services." 29 U.S.C. § 213(a)(15).
*1308 3. The statute of limitations governing FLSA claims provides for a two year statute of limitations, unless the violation is "willful," in which the statute of limitations is extended to three years. 29 U.S.C. § 255(a).
4. Under § 255(a) of the FLSA, a claim accrues when the employer failed to pay the required compensation. 29 U.S.C. § 255(a).
5. An action is deemed to have been "commenced" in collective actions as to individual claimants by the filing of the complaint in which he or she is specifically named.
6. Plaintiff Dale Jean Terwilliger filed her complaint on November 12, 1996.
7. Plaintiffs Waseleus, Turner, and Hadley joined the action on March 28, 1997, with the filing of Plaintiffs' First Amended Complaint.
8. The remaining Plaintiffs joined the action with the filing of Plaintiffs' Second Amended Complaint on June 18, 1997.
9. Under the standard for a "willful" violation under the FLSA, the Plaintiffs must prove that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). Negligence or an incorrect assumption that a pay plan complies with the FLSA do not meet the criteria for a willful violation of the FLSA. Id. The burden is on the employee to prove that the employer committed a willful FLSA violation. Gilligan v. City of Emporia, Kan., 986 F.2d 410, 413 (10th Cir.1993).
10. Plaintiffs argue that in a residence where the client is unable to contribute anything to the upkeep, all domestic activities must be considered "general household work," and therefore the twenty percent threshold is clearly exceeded. The corollary to this argument is that Defendant was on notice that in certain of its residences the clients were totally unable to perform any upkeep and therefore, notwithstanding other considerations, Defendant knew or should have known that the companionship services exemption could not apply to Home of Hope. The Court rejects Plaintiffs' argument and expressly declines to find that in such a residence all domestic activities by health care providers are necessarily "general household work." This determination depends entirely on the facts and circumstances of each residence. Accordingly, the existence of such residences did not put Defendant on notice that the companionship services exemption could not apply to Home of Hope.
11. Under the standards established by McLaughlin, the Court finds that the Plaintiffs have failed to meet their burden of proof that Home of Hope knew or showed reckless disregard for the matter of whether its use of the companion services exemption was prohibited by law.
12. Based on the record in this case, Plaintiffs' claims should be measured by reference to a two-year statute of limitations.
13. Application of the two-year statute of limitations reflects the following possible applicable periods of recovery:

Plaintiff Applicable period of recovery
Dale Jean Terwilliger November 12, 1994 to November 12, 1996
Deborah Waseleus March 28, 1995 to March 28, 1997
Patricia Turner March 28, 1995 to March 28, 1997
Linda Hadley March 28, 1995 to March 28, 1997
Martina Marie Alexander June 18, 1995 to June 18, 1997
Trina S. Bowlin June 18, 1995 to June 18, 1997
Kenneth Cobb June 18, 1995 to June 18, 1997
Robert Jason Coleman June 18, 1995 to June 18, 1997
Sherry Lea Cornwell June 18, 1995 to June 18, 1997
Jodi Arlene Crandlemire June 18, 1995 to June 18, 1997
Glenda S. Donohue June 18, 1995 to June 18, 1997
Cora Sue Foreman June 18, 1995 to June 18, 1997

*1309
Rachel Marie George June 18, 1995 to June 18, 1997
Barry Thomas Heirston June 18, 1995 to June 18, 1997
Anna Marie Henry June 18, 1995 to June 18, 1997
Toby Lee Hooten June 18, 1995 to June 18, 1997
Katherine Ann Brenner Howard June 18, 1995 to June 18, 1997
Brenda Jean Hulcher June 18, 1995 to June 18, 1997
Francis Darlyne Kerns June 18, 1995 to June 18, 1997
Carolyn Louise Lacey June 18, 1995 to June 18, 1997
Yvonne Lynnette Littlefield June 18, 1995 to June 18, 1997
Robert Dale Pasley June 18, 1995 to June 18, 1997
Mary A. Piepmeyer June 18, 1995 to June 18, 1997
Penny Luann Rice June 18, 1995 to June 18, 1997
Kassey J. Samples June 18, 1995 to June 18, 1997
Carol Ursula Smallwood June 18, 1995 to June 18, 1997
Dixie Sue Sparks June 18, 1995 to June 18, 1997
Tambra Sue Suter June 18, 1995 to June 18, 1997
Jody D. Terwilliger June 18, 1995 to June 18, 1997
Julie Michell Wandell June 18, 1995 to June 18, 1997
Mary Alice Weins June 18, 1995 to June 18, 1997

IT IS SO ORDERED.